# UNITED STATES DISTRICT COURT

### for the
### Eastern District of Virginia

NOV 1 2017

UNDER SEAL

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Apple iPhone, Model A1784<br>IMEI: 353812080782296 | )<br>)<br>)<br>)<br>)<br>) |

Case No. 1:17sw741

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A (incorporated by reference).

located in the _____Eastern_____ District of _____Virginia_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 846 | Possession with the Intent to Distribute Controlled Substances and Conspiracy |

The application is based on these facts:
See attached affidavit of Michael A. Fernald, ATF Special Agent.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael A. Fernald,  ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   _____11/01/2017_____

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, Virginia

Theresa Carroll Buchanan, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A

The property to be searched is listed below and currently located at the United States Attorney's Office for the Eastern District of Virginia located at 2100 Jamieson Avenue, Alexandria, Virginia 22314:

| Number | Description | Serial or Other Number | Reference in Affidavit |
|--------|-------------|------------------------|------------------------|
| 1 | Apple iPhone Model: A1784 | IMEI: 353812080782296 | Device #1 |
| 2 | LG Model LG-B470 | IMEI: 354104087523546 | Device #2 |
| 3 | Samsung Galaxy S8 | IMEI: 356982080564934 | Device #3 |
| 4 | Samsung Galaxy S8+ | IMEI: 355989082145801 | Device #4 |

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

23

## ATTACHMENT B

1.      All records on the Devices described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846, and involve Rashourn Niles and/or Kai Evans, including:

      a.   Any conversations, whether through text messages or other applications, where Rashourn Niles and/or Kai Evans discusses controlled substances;

      b.   lists of customers and related identifying information;

      c.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      d.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      e.   Any photographs or videos of controlled substances or large amounts of U.S. currency;

      f.   any information recording Rashourn Niles or Kai Evans' schedule or travel from February 2017 to the date phones came into law enforcement's possession; and

      g.   all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



IN THE MATTER OF THE SEARCH OF

Apple iPhone, Model A1784
IMEI: 353812080782296

**Under Seal**

CURRENTLY LOCATED AT
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue, Alexandria, VA 22314

1:17-sw-741

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Michael A. Fernald, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from those devices of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been since 2014. I am trained as a Digital Media Collection Specialist with ATF and have experience and training in obtaining data from electronic devices, including cellular and multimedia devices. I also have experience investigating narcotics and firearms trafficking offenses as well as searching electronic devices for evidence of narcotics and firearms trafficking offenses.

3.      Based on my training and experience, and the experience of other law enforcement officers, in investigating narcotics and the distribution of narcotics while armed, I know that it is common for individuals engaged in this activity to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities. I know that "smart" phones play an integral role in the daily lives of individuals engaging in narcotics trafficking and that these individuals use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and telephone conversations. I also know that it is common for narcotics traffickers to use multiple "smart" phones to communicate with co-conspirators in order to compartmentalize their illegal activity and avoid detection by law enforcement. Further, I know it is common for narcotics traffickers to change their phones and phone numbers in order to avoid detection by law enforcement.

4.      The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from federal and state law enforcement officers, and information obtained from interviews and analysis of reports.

5.      This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.      The property to be searched is listed below (hereinafter referred to as "the Devices"). From the time the Devices were seized to when the Devices were transferred to federal custody on October 30, 2017, the Devices were stored by the Prince William County Police Department ("PWCPD"). The Evidence Section is located at 9303 Peabody Street,

Manassas, Virginia 20110, which is within the Eastern District of Virginia. The Devices are

currently stored in the United States Attorney's Office for the Eastern District of Virginia located

at 2100 Jamieson Avenue, Alexandria, Virginia 22314. The Devices are listed in the below

table.

| Number | Description | Serial or Other Number | Reference in Affidavit |
|--------|-------------|------------------------|------------------------|
| 1 | Apple iPhone Model: A1784 | IMEI: 353812080782296 | Device #1 |
| 2 | LG Model LG-B470 | IMEI: 354104087523546 | Device #2 |
| 3 | Samsung Galaxy S8 | IMEI: 356982080564934 | Device #3 |
| 4 | Samsung Galaxy S8+ | IMEI: 355989082145801 | Device #4 |

7.      The applied-for warrant would authorize the forensic examination of the Devices

for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

A.      Background on the Investigation

8.      In February 2017, a cooperating source ("CI-1") reported to PWCPD that Tarvell

Vandiver was a narcotics distributor. CI-1 is a member of the Imperial Ganster Blood gang. CI-

1 will be referred to in the masculine gender, regardless of CI-1's true gender. CI-1 has been

convicted of two felonies, including robbery and a probation violation. He was arrested in

December 2016, in Prince George's County, Maryland, for possessing a stolen firearm as a

convicted felon and possession of controlled substances. CI-1 originally cooperated because he

hoped to receive a lesser sentence. Based on CI-1's cooperation, Prince George's County

dismissed his charges. CI-1 continues to cooperate because he is being compensated. CI-1 also

hopes to be relocated.

3

9. CI-1 stated that Tarvell Vandiver's source of supply is his stepfather, who was later identified as RASHOURN NILES.

10. Based on this information and because Vandiver is a known member of the Imperial Gangster Blood gang, ATF opened an investigation into Vandiver.

B. Purchase of MDMA on March 11, 2017

11. On March 8, 2017, CI-1 reported to law enforcement that there would be an Imperial Gangster Blood gang meeting on March 11, 2017. CI-1 reported Vandiver would be at the meeting and that he would be able to purchase cocaine from Vandiver. On March 11, 2017, the meeting took place at the Hilton Garden Inn located on Neabsco Common Place, Woodbridge, Virginia, which is within the Eastern District of Virginia.

12. Prior to the meeting, CI-1 rented the hotel room for the meeting and granted ATF access to place audio/video recorders in the room. Based on my review of the recording, I believe CI-1's description of the events and conversations at the gang meeting was accurate.

13. Prior to the gang meeting, CI-1 met with law enforcement officers. ATF special agents searched CI-1 and his vehicle for contraband with negative results. Agents then provided CI-1 with ATF agent cashier funds to purchase cocaine and/or a firearm from Vandiver and/or other co-conspirators. An audio recorder was also placed on CI-1's person.

14. Law enforcement then followed CI-1 to the hotel. During the trip, CI-1 had a FaceTime conversation with Vandiver, who reported that he (Vandiver) would meet CI-1 at the hotel. Shortly thereafter, law enforcement observed Vandiver arrive at the hotel.

15. Later that evening, CI-1 and Vandiver left the hotel in CI-1's vehicle. Law enforcement followed CI-1 from the hotel to a store on Worth Avenue. CI-1 stated that Vandiver called his molly source of supply and that Vandiver was told to meet at that location.

4

While CI-1 and Vandiver were waiting in the vehicle, an individual approached CI-1's vehicle and leaned through the open window to speak with Vandiver. CI-1 positively identified RASHOURN NILES from a DMV photograph, as being the individual who leaned through CI-1's window to speak with Vandiver. NILES made a statement to Vandiver to the effect of "you know what I drive," followed by a description of where his vehicle was parked within the parking lot. CI-1 drove Vandiver to the specified location where Vandiver entered NILES vehicle, retrieved an unknown quantity of molly, and left cash payment for the molly within the vehicle.

      C.     <u>Controlled Purchase of Cocaine from Vandiver on March 23, 2017</u>

16.     On March 23, 2017, at law enforcement direction, CI-1 ordered two (2) ounces of cocaine from Vandiver. Vandiver agreed to sell the cocaine for $2,600. During this conversation, CI-1 and Vandiver agreed to meet at a location in the Eastern District of Virginia to conduct the transaction. Prior to the controlled purchase, law enforcement searched CI-1 along with his vehicle and found it to be free of illegal items. Law enforcement then provided CI-1 with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio recorded.

17.     When CI-1 arrived at the location, Vandiver instructed CI-1 to enter his (Vandiver's) vehicle. Prior to CI-1's arrival a surveillance team observed Vandiver meet with an adult black male who arrived and departed in a vehicle known to be operated by NILES. This meeting took place immediately prior to CI-1's arrival at the same location where CI-1 was instructed to meet Vandiver. Law enforcement observed Vandiver and CI-1 drive away. While in the car, Vandiver discussed recent ounce-level drug deals he made to two additional co-conspirators.

5

18.     Law enforcement followed Vandiver's vehicle to the area of Bellona Road,

Woodbridge, Virginia. Law enforcement observed Vandiver and CI-1 exit the vehicle and enter

an apartment. According to CI-1, once inside, Vandiver made a statement to the effect "I just

met my stepfather right there, he just brought this shit to me just now because I had run out"

(NILES is Vandiver's stepfather).  Further, I can confirm that Vandiver is recorded saying this

on the audio recording.

19.     Vandiver then retrieved a bag of cocaine from underneath his clothing.  Vandiver

informed CI-1 that he had a little over two (2) ounces of cocaine and CI-1 agreed to purchase the

cocaine and provided Vandiver with $2,600.  Vandiver weighed out two (2) ounces, packaged it,

and provided it to CI-1.  Vandiver then took the remainder of the cocaine and secured it

underneath his clothing.

D.      Controlled Purchase of Cocaine from Vandiver on March 30, 2017

20.     In the days leading up to March 30, 2017, CI-1, at law enforcement direction,

arranged to purchase a "four deuce" (4.5 ounces) of cocaine from Vandiver.  Vandiver agreed to

sell the cocaine for $5,400.  CI-1 and Vandiver agreed to meet at a location in the Eastern

District of Virginia to conduct the transaction.  Prior to the controlled purchase, law enforcement

searched CI-1 and his vehicle and found it to be free of illegal contraband.  Law enforcement

then provided CI-1 with ATF agent cashier funds to conduct the controlled purchase.  The

controlled purchase was also audio recorded.

21.     While inside the location where the transaction took place, CI-1 stated that

Vandiver appeared to become confused at how much cocaine he should have left after making a

series of previous sales.  According to CI-1, Vandiver then placed a phone call to NILES.

Vandiver began the phone call by stating, "What you say that joint was you gave me before?"

6

Vandiver paused then asked, "You sure bro?" Vandiver then paused again, stated several words

that are not immediately intelligible, and stated, "That don't add up to no god damn 6."

Vandiver then ran through the addition of a group of numbers, and made a statement that

appeared to suggest Vandiver did not think the amount remaining and the amount he had

previously sold added up to the amount he was charged with purchasing. Vandiver added up

numbers out loud leading to a total of "161" (161 grams is equal to 5.75 ounces). Toll records

from Vandiver's phone number during this time frame show 5 phone calls between (703) 226-

9912 (a phone number that has been previously identified as being used by Vandiver) and (202)

899-0228 (this number was later identified to belong to NILES).

     E.     Controlled Purchase of Cocaine from Vandiver on April 6, 2017

     22.     In the days leading up to April 6, 2017, CI-1, at law enforcement direction,

arranged to purchase two (2) ounces of "crack" cocaine and one (1) ounce of powder cocaine

from Vandiver. Vandiver agreed to sell the cocaine for approximately $5,000 (the actual final

cost was $4,900). CI-1 and Vandiver agreed to meet at a location in the Eastern District of

Virginia to conduct the transaction. Prior to the controlled purchase, law enforcement searched

CI-1 and his vehicle and found it to be free of illegal contraband. Law enforcement then

provided CI-1 with ATF agent cashier funds, as well as audio recording and transmitting

device(s) to conduct the controlled purchase.

     23.     After meeting with Vandiver, CI-1 and Vandiver traveled to a location in Prince

William County where the transaction was to take place. While inside this location, in the

presence of CI-1, an adult resident of that location, and several small children, Vandiver began

manufacturing crack cocaine. According to CI-1, at some point during this process, Vandiver,

worried about the quality of his cooking and called NILES to seek guidance. Law enforcement

7

has reviewed the audio recordings and I can confirm that I hear background noises consistent with cooking crack cocaine, including the use of a microwave and mixing items in a glass container. After a period of time Vandiver can be heard calling someone and speaking to a subject believed to be NILES. According to Vandiver's toll records, several phone calls were placed during this time period to (202) 899-0228.

24.     Approximately 25 minutes after CI-1 purchased the crack cocaine and left Vandiver, Vandiver placed a phone call to (202) 899-0228. Approximately 14 minutes later, both Vandiver's vehicle and the NILES vehicle were observed parked, unoccupied, in front of a residence within Prince William County, Virginia. The mother of Vandiver's children resides at this residence, NILES does not reside here.

F.     Controlled Purchase of Heroin from NILES on April 26, 2017

25.     In the days leading up to April 26, 2017, CI-1, at law enforcement direction, arranged to purchase two (2) ounces of "crack" cocaine and one (1) ounce of powder cocaine from Vandiver. Prior to the transaction taking place, Vandiver reported to CI-1 that he was "dry" (out of cocaine). CI-1 also discussed purchasing heroin through another co-conspirator ("Co-Conspirator 1") via Vandiver. CI-1 and Vandiver agreed to meet at a location in the Eastern District of Virginia to conduct the transaction. Prior to the controlled purchase, law enforcement searched CI-1 and his vehicle and found it to be free of illegal contraband. Law enforcement then provided CI-1 with ATF agent cashier funds, as well as audio and video recording and transmitting device(s) to conduct the controlled purchase.

26.     After meeting with Vandiver, CI-1 and Vandiver traveled to a location in Prince William County and picked up Co-Conspirator 1. They traveled to an area restaurant and Co-Conspirator 1 agreed to sell heroin to CI-1 in the future. Co-Conspirator 1 reported he was going

8

to Washington, DC and he was dropped off back at the location where he was picked up. Co-Conspirator 1 later informed Vandiver that he was staying in Washington, DC and that he did not want to return to Prince William County that evening.

27.     At this time, CI-1 asked Vandiver to call NILES to see if he could facilitate a heroin transaction. In CI-1's presence, Vandiver called NILES via FaceTime and asked him if he could assist in obtaining heroin for them. They agreed to meet at a location in Prince William County. Vandiver and CI-1 obtained a hotel room at an area hotel and then waited in Vandiver's vehicle in the parking lot. A short time later, NILES was observed pulling into the same hotel parking lot. NILES then parked his vehicle next to Vandiver's vehicle.

28.     NILES told Vandiver and CI-1 that he would help them out this time, but they would need to exchange phone numbers with the co-conspirator ("Co-Conspirator 2") and go direct with Co-Conspirator 2 in the future. A short time later, a silver Land Rover bearing Maryland registration occupied solely by Co-Conspirator 2 pulled in and parked in the same hotel parking lot. CI-1, Vandiver, NILES, and Co-Conspirator 2 all exited their vehicles and entered the hotel.

29.     After introductions were made, CI-1 exchanged phone numbers with Co-Conspirator 2. CI-1 then provided Co-Conspirator 2 with $6,900 and purchased approximately 79 grams of heroin. After the transaction, all subjects left the hotel in the vehicles they arrived in.

30.     During this transaction, while NILES was talking to CI-1 and Vandiver, law enforcement placed a spoofed phone call to phone number, (202) 899-0228. NILES answered the phone call confirming he was in fact using this telephone number consistent with the prior transaction toll records.

9

G.    Controlled Purchase of Cocaine from NILES on August 31, 2017

31.    On August 31, 2017, at law enforcement direction, CI-1 arranged to purchase ten (10) ounces of "crack" cocaine from Vandiver. Prior to the controlled purchase, law enforcement searched CI-1 and his vehicle and found it to be free of illegal contraband. Law enforcement then provided CI-1 with ATF agent cashier funds, as well as audio recording and transmitting device(s) to conduct the controlled purchase.

32.    In the afternoon hours, law enforcement observed NILES parked at a residence in Prince William County. Law enforcement then observed NILES depart this residence and drive to Alexandria, Virginia. After arriving at this location, NILES was observed selecting a relatively remote area to park, which offered a view of any approaching vehicle. Shortly thereafter, NILES departed that location but not before making a series of turns in the same direction and traveling immediately back to the same parking spot. This behavior is known as "squaring the block" and is often used as a counter surveillance method to ensure a vehicle is not under surveillance.

33.    Prior to meeting with Vandiver, CI-1 made a recorded FaceTime call to Vandiver. During the FaceTime call, Vandiver and CI-1 agreed to meet at a location in the Eastern District of Virginia. After meeting with Vandiver inside CI-1's vehicle, CI-1 informed Vandiver that he wanted to purchase ten (10) ounces of crack cocaine. Vandiver stated, "I can get it now." According to CI-1, Vandiver exited his vehicle and placed a call on his cell phone. CI-1 heard Vandiver state to the person he was talking to on the phone "I need 10." According to Vandiver's toll records, several phone calls were placed during this time period to (202) 294-2304 (known to be NILES's previous phone number).

10

34.     At this time, law enforcement observed NILES driving on Interstate 95 south and then exit onto Prince William Parkway. NILES then drove to an apartment complex in Prince William County and was observed entering an apartment. During this time, CI-1 drove Vandiver in CI-1's vehicle to a restaurant in Prince William County. According to CI-1, CI-1 and Vandiver waited in the restaurant for NILES to deliver the ten (10) ounces of powder cocaine. NILES was then observed exiting an apartment in Prince William County holding a white plastic bag, entering a vehicle, and departing the apartment complex. At that time, CI-1 notified law enforcement that NILES was five (5) minutes away. Approximately seven minutes later, NILES arrived in the area of CI-1 and Vandiver.

35.     In the presence of CI-1, Vandiver made a phone call. Vandiver began the call by stating, "If you not here, I should pull off this shit is empty as fuck bro. I should've been in the movie theatre where all the cars at my nigga, shit look goofy as hell." C I-1 then offered to move to a better location. Vandiver continued his phone conversation and stated, "I'm right here in this Mercedes right here." Vandiver paused then asked, "You see me?" Toll records from Vandiver's phone number during this period show several phone calls were placed during this time to (202) 294-2304. According to CI-1, Vandiver exited CI-1's vehicle and entered the vehicle with NILES. A few minutes later, law enforcement observed Vandiver exit NILES' vehicle holding a white plastic bag and enter CI-1's vehicle. Additionally, CI-1 reported Vandiver used his own money to purchase the cocaine from NILES.

36.     After the transaction, NILES drove to a residence in Prince William County. Approximately six minutes later, a black pickup truck arrived at an address on Cloverdale Road in Woodbridge. After parking the black pickup truck, a black male exited the driver's seat of the

11

vehicle and met with NILES. Approximately three minutes later NILES and the unknown male departed from the address on Cloverdale Road inside the black pickup truck.

37.     According to CI-1, Vandiver then went to a Big Lots store in Prince William County and purchased a Pyrex measuring cup, which Vandiver later used to cook crack cocaine. Vandiver then entered CI-1's vehicle and they drove to an apartment complex in Prince William County. After both parties exited the vehicle, law enforcement observed Vandiver carrying a white plastic bag. Vandiver and CI-1 entered an apartment where Vandiver resides. According to CI-1, after entering the apartment, Vandiver placed the white plastic bag on the kitchen counter, removed portions of the cocaine from the clear plastic baggies inside the white plastic bag into various cooking utensils, measured them, added water, and cooked the powder cocaine into crack cocaine. Law enforcement has reviewed the audio recordings and can detect background noises consistent with cooking crack cocaine, including water coming out of a faucet and mixing items in a glass container.

38.     Approximately 90 minutes after Vandiver and CI-1 arrived, Vandiver and CI-1 exited the apartment. Law enforcement observed Vandiver carrying a white plastic bag. Vandiver then drove CI-1 to a residence in Prince William County. According to CI-1, Vandiver and CI-1 drove to the residence because the amount of crack cocaine was too large to be weighed on Vandiver's scale and Vandiver had access to a bigger scale at a separate residence in Prince William County. After arriving, both parties exited Vandiver's vehicle and entered the residence. While inside, Vandiver and CI-1 weighed the crack cocaine on a digital scale. CI-1 video recorded a white plastic bag containing the crack cocaine being weighed, law enforcement has reviewed the video and the scale showed a weight of 387 grams. A short time later, CI-1 provided Vandiver with $14,950 for the crack cocaine.

H.     Surveillance of Rashourn Niles and Kai Evans

39.     On October 15, 2017, law enforcement conducted surveillance on NILES. On this date, NILES was followed to multiple locations of note in this investigation.

40.     NILES was initially observed at an address on Cloverdale Road in Woodbridge. Vandiver and NILES use this residence to store firearms and drugs. CI-1 purchased two firearms from Vandiver at this residence on July 27, 2017. Then, for the August 31, 2017 purchase described in detail above, CI-1 and Vandiver took the manufactured cocaine base to this residence in order to weigh it on a scale.

41.     NILES was then followed to a residence on Bayside Drive, Fredericksburg, Virginia, where NILES was observed meeting with individuals. At the residence, law enforcement observed a 2012 Audi sedan bearing VA XXX-4345, which is registered to KAI EVANS. Moreover, law enforcement have observed NILES at this residence on Bayside Drive either before or after a drug deal on other occasions.

I.     Seizure of the Devices from NILES by the Prince William County Police

42.     On October 24, 2017, the Prince William County Police Department ("PWCPD") seized the Devices. Below, I describe the details of the PWCPD seizure and subsequent search.

43.     While conducting a drug investigation, PWCPD encountered NILES and EVANS meeting in a parking lot of a restaurant located in Woodbridge, Virginia. During their investigation, PWCPD was conducting surveillance in a restaurant parking lot known to be frequented by drug users and distributors. PWCPD personnel observed the front passenger of a silver Cadillac, later identified as EVANS, directing the driver, later identified as NILES, to park in a far area of a parking lot away from the restaurant. Neither occupant entered the restaurant. The Cadillac parked beside a silver Audi bearing VA registration XXX-4345. This is significant

13

because this Audi is the same Audi described in paragraph 14. EVANS was observed walking back and forth between the Cadillac and Audi multiple times, while NILES remained in the Cadillac. When PWCPD approached the Cadillac, the detectives observed bundles of U.S. currency sitting on EVANS' lap. EVANS was observed sliding one bundle of U.S. currency into his left front pants pocket. PWCPD personnel observed that both EVANS and NILES were visibly distraught and nervous.

44.     A drug detection K-9 was summoned and had a positive alert on the Cadillac for the presence of controlled substances. A subsequent search of the vehicle resulted in a small quantity of marijuana being located underneath the driver's seat (which is where NILES was sitting). Three cellular phones (Devices 1-3) were located on the driver's seat and center console of the Cadillac. Device 4 was recovered from EVANS' person. Between the seat and passenger door of the Cadillac, were two bundles of U.S. currency held together by rubber bands. Based on the PWCPD detective's training and experience, this is a common way of keeping quantities of U.S. currency stored for drug transactions. The U.S. currency totaled $9,120.

45.     After being advised of their *Miranda* rights, NILES was asked about the U.S. currency in the Cadillac. NILES stated the only money he would claim was in his wallet. NILES further stated that the two bundles of U.S. currency located in the vehicle may belong to the owner of the vehicle he was operating "or anyone." EVANS stated the only currency he had was the approximately $4,600 on his person. Critically, the currency on EVANS' person was bundled the same way as the other two bundles of U.S. currency that law enforcement seized from the vehicle.

46.     At that point, PWCPD personnel determined that the $9,120 in U.S. currency coupled with NILES and EVANS' denial of ownership of the $9,120 supported that a drug

14

transaction had taken place. In addition, the PWCPD K9 handler deployed his K9 on NILES, EVANS, and a detective who was holding the $9,120 behind his back. The K9 did not alert on NILES or EVANS, but did alert on the detective holding the currency for the presence of controlled substances. Prior to seizing the U.S. currency and the Devices, PWCPD personnel also reviewed the criminal histories of both NILES and EVANS and determined that both subjects had multiple drug related charges.

47. A PWCPD detective also reported that he had observed EVANS' Audi bearing VA XXX-4345 on a prior occasion at an area high school. While there, the detective observed an unidentified male walk up to the Audi, enter the passenger seat, and then leave approximately 15-30 seconds later. Based on that detective's experience, this behavior was consistent with a controlled substance transaction.

48. Based on all of the above information, PWCPD personnel seized the Devices to obtain a search warrant to further their investigation.

49. The Devices are described as follows:

    a. Device 1 — Apple iPhone, Model A1784, IMEI: 353812080782296

    b. Device 2 — LG Model LG-B470, IMEI: 354104087523546

    c. Device 3 — Samsung Galaxy S8, IMEI: 356982080564934

    d. Device 4 — Samsung Galaxy S*+, IMEI: 355989082145801

50. On October 25, 2017, PWCPD obtained a search warrant in the Commonwealth of Virginia for the Devices. The PWCPD was unsuccessful in gaining access to and searching Devices 1, 3, and 4. The PWCPD was able to access Device 2, but was unsuccessful in extracting the data from the device.

51.     Based on my training and experience, I know drug dealers to have more than one phone to conduct their illicit business. Many dealers will have separate phones for customers, sources of supply for drugs, and family. While agents cannot guarantee all phones are owned or used by NILES and/or EVANS, the only way to determine this information is to access the Devices. Agents will minimize their access and search of the data if any of the Devices are determined not to be owned or used by NILES and/or EVANS.

52.     The Devices are currently in storage at the United States Attorney's Office for the Eastern District of Virginia, which is located at 2100 Jamieson Avenue, Alexandria, Virginia 22314.

53.     In an abundance of caution, I am seeking a search warrant for the Devices, so that the ATF and the Federal Bureau of Investigation ("FBI") can assist in accessing, searching, and using the data contained within the Devices. After a search warrant is obtained for the Devices, ATF or FBI will begin the search of the Devices within the Eastern District of Virginia. If ATF or FBI cannot complete the search then agents will send the Devices to a private company that specializes in data extraction from Apple iPhones and other electronics. This private company will either (a) unlock the Devices and then return the Devices to the ATF or FBI office located in the Eastern District of Virginia, where the actual analysis of the contents of the Devices will take place or (b) unlock the Devices and create a forensic image of the Devices, and then return the Devices to the ATF or FBI office located in the Eastern District of Virginia, where the actual analysis of the contents of the Devices will take place.

## TECHNICAL TERMS

54.     Based on my training and experience, I use the following technical terms to convey the following meanings:

16

a.  *Wireless telephone*:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include:  storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  *Digital camera*:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored

17

images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically

18

calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

f. *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

55.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at http://www.apple.com/iphone/, http://www.lg.com/us/support-mobile/lg-LGB470, and https://www.samsung.com/us/explore/galaxy-s8/, I know that the Devices have capabilities that

19

allow them to serve as the following: a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on smart phones can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

56. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

57. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

58. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

20

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

59. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

60. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve

21

the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the

Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

61.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Devices described in Attachment A to seek the items

described in Attachment B.

Respectfully submitted,

Michael Fernald
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me on November 1, 2017:

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

22

# ATTACHMENT A

The property to be searched is listed below and currently located at the United States

Attorney's Office for the Eastern District of Virginia located at 2100 Jamieson Avenue,

Alexandria, Virginia 22314:

| Number | Description | Serial or Other Number | Reference in Affidavit |
|--------|-------------|------------------------|------------------------|
| 1 | Apple iPhone Model: A1784 | IMEI: 353812080782296 | Device #1 |
| 2 | LG Model LG-B470 | IMEI: 354104087523546 | Device #2 |
| 3 | Samsung Galaxy S8 | IMEI: 356982080564934 | Device #3 |
| 4 | Samsung Galaxy S8+ | IMEI: 355989082145801 | Device #4 |

This warrant authorizes the forensic examination of the Devices for the purpose of

identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.     All records on the Devices described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846, and involve Rashourn Niles and/or Kai Evans, including:

   a. Any conversations, whether through text messages or other applications, where Rashourn Niles and/or Kai Evans discusses controlled substances;

   b. lists of customers and related identifying information;

   c. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   d. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   e. Any photographs or videos of controlled substances or large amounts of U.S. currency;

   f. any information recording Rashourn Niles or Kai Evans' schedule or travel from February 2017 to the date phones came into law enforcement's possession; and

   g. all bank records, checks, credit card bills, account information, and other financial records.

2.     Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

24